# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DAQUAN ANDREW PRITCHETT,

       Defendant-Appellant.

UNPUBLISHED
April 20, 2017

No. 329901
Kalamazoo Circuit Court
LC No. 2014-001082-FC

Before: O'BRIEN, P.J., and SERVITTO and STEPHENS, JJ.

PER CURIAM.

Daquan Andrew Pritchett was convicted by a jury of second-degree murder, MCL 750.317, possession of a firearm during the commission of a felony, MCL 750.227b, and retaliating against a witness, MCL 750.122(8), and sentenced to concurrent prison terms of 20 to 50 years for the murder conviction and 5 to 10 years for the witness retaliation conviction as well as a consecutive prison term of 2 years for the firearm conviction. He appeals as of right his October 19, 2015 judgment of sentence. We affirm.

## I. FACTUAL BACKGROUND

Christopher Lee Adams was shot and killed by defendant on July 23, 2014. The shooting was the product of a three-day conflict between two groups of three individuals: (1) Adams, Christian Ruiz, and Tyler Bishop, and (2) defendant, Charles Wright, and Darrion Pulliam. On July 21, 2014, two days before the shooting, the victim and Ruiz met with Tony Briones, Wright, and Pulliam to sell them marijuana. The victim and Ruiz gave Briones, Wright, and Pulliam the marijuana; Briones, Wright, and Pulliam handed the victim and Ruiz what they believed was a $100 bill. After both groups of men left the transaction, however, Ruiz discovered that it was not, in fact, a $100 bill; rather, it was a seemingly worthless coupon. The victim and Ruiz attempted to confront the other three immediately after realizing this, but "they had took off already running." So, the victim and Ruiz "got back in the car and went on with [their] night." Later that evening, Ruiz and several other individuals apparently searched for them in hopes of obtaining the $100, and they eventually came into contact with defendant. One of the other people with Ruiz, Justin Key, "was asking questions to Daquan asking him if he'd see some guys running around o[r] if he heard of anything, if he'd let him know," but defendant "said he hadn't seen nothing . . . ."

-1-

The following day, on July 22, 2014, Adams, Ruiz, and Bishop, now joined by Ashley Sootsman, "went to get some more weed" in Ashley's minivan and eventually "seen them," meaning a group of individuals that included Wright, "on the porch" of a home on Mt. Olivet Rd. in Kalamazoo, Michigan. Defendant, Ruiz, and Bishop apparently came up with a plan to have Sootsman "ask 'em for directions to see if [they] could get 'em to come out to the road" to "fight 'em." The plan was unsuccessful, however, because the individuals remained on the porch and "pretty much just told her to just keep going straight." Disappointed with the outcome of this exchange, the four decided to continue "down the road" but "ended up coming back" and "started yelling, talking smack" and "telling 'em to meet us in the street, calling 'em pussies, you know." The individuals on the porch "didn't really do nothing" in response to the yelling and name calling.

The next day, on July 23, 2014, Adams, Ruiz, Bishop, and Sootsman again decided to travel around the area in Sootsman's minivan. In doing so, they returned to Mt. Olivet Rd. and "saw Charles and Daquan walking down the road and Darrion." According to Ruiz, they decided to confront them: "I was thinking oh, that's them and then I said it and Tyler was like oh, yeah, that's them, Chris. Oh, yeah, so we . . . turned around and pulled up on them." Ruiz explained the remainder of the confrontation, in pertinent part, as follows:

> I went to go chase after . . . I can't remember who it was, [but] it wasn't the flat top kid [Wright]. I went to go chase after Darrion cause he was running, to go after him. And I took a couple steps and I heard Chris say he's got a gun. And I stopped and turned around, ran and dove back into the van.
>
> * * *
>
> Well, when I heard him say that, I had stopped frozen in my tracks and went to go turn around and I could see Daquan standing there. Well, I have peripherals in my eye. I could see Daquan standing there with his arm straight up. And . . . at that time you heard a gun shot go off.
>
> * * *
>
> Proceeded to run and jump into the van. I got inside the van and then Chris jumped in on top of me. I could see out the back seat of the van and I could see like --. I could just hear a lot of shots and I could see Tyler. And then I remember kinda coming to. I was kinda like blacked out for a minute. I remember kinda coming to and then pushed Chris off of me and he was shot and pulled Tyler into the van and took off."

After realizing that Adams had been shot, Ruiz "just laid him up on the seat," "started putting pressure on his chest," and "told Ashley to take off." They arrived at the hospital shortly thereafter, but Adams did not survive. According to Dr. Joyce DeJong, who testified "as an expert in the area of forensic pathology," two factors led to Adams's death: "exsanguination or bleeding to death . . . and also there's an asphyxial component."

Defendant essentially admitted that he did, in fact, shoot at the minivan; however, he claimed he did so in self-defense. At trial, defendant acknowledged that he obtained a firearm,

which he described as "a little itty-bitty gun, like the size of [his] palm," the day before the shooting "[c]ause [he] was scared, you know." Defendant acknowledged that, during the July 23, 2014 confrontation, he fired multiple shots, including one "into the air" and a second "in the vicinity of" the van. He claimed that he did so "[b]ecause [he] was scared" and "[f]ear[ed] for [his] life." Four days after the shooting, on July 27, 2014, defendant voluntarily went to law enforcement "to set the record straight" because "[h]e wasn't happy with the media and how they portrayed him," according to a staff lieutenant with the Kalamazoo Department of Public Safety. Defendant then proceeded to make multiple statements to law enforcement, during which he defended his actions as having been done during "a black-out" or in self-defense.

Defendant was subsequently charged with first-degree murder, MCL 750.316, and felony firearm, MCL 750.227b. On August 20, 2014, the day after the preliminary examination on those charges, defendant spoke with a female named Ostayvionna Williams and made what the prosecution alleged were requests "to physically assault two witnesses that testified at the preliminary examination." For example, defendant told Williams that "[h]e was not happy about" testimony at preliminary examination and told Willaims to "tell two friends," "Anthony and Caleb," to "do what they got to do, man, real shit, put the paws on them . . . ." In light of this, the prosecution filed, and the trial court granted, a motion to amend the information to include a witness-retaliation charge.

After a multiple-day trial, the jury found defendant guilty of second-degree murder, MCL 750.317, felony firearm, MCL 750.227b, and witness retaliation, MCL 750.122(8). The trial court sentenced defendant as described above, and this appeal followed.

## II. ANALYSIS

### A. SPECIALIST LATHAM'S TESTIMONY

On appeal, defendant first argues that he was deprived of his constitutional right to a fair trial because Gary Latham ("Specialist Latham"), a crime lab specialist with the Kalamazoo Department of Public Safety, was permitted to offer expert testimony regarding firearms without being qualified as an expert. We disagree.

Preserved evidentiary issues are reviewed for an abuse of discretion. *People v Orr*, 275 Mich App 587, 588; 739 NW2d 385 (2007). However, because these arguments were not properly preserved for appellate review, they are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Constitutional errors are generally reviewed de novo. *People v Rodriguez*, 251 Mich App 10, 25; 650 NW2d 96 (2002).

MRE 701 and 702 govern the admissibility of opinion testimony. MRE 701 governs the admissibility of opinion testimony by lay witnesses:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

-3-

MRE 702 governs the admissibility of expert testimony:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As this Court has recognized before, the interplay between MRE 701 and MRE 702 when a police officer provides testimony based on his or her training and experience is somewhat unclear. See *People v Dobek*, 274 Mich App 58, 77; 732 NW2d 546 (2007) ("The caselaw on this issue is not entirely clear."). In *Dobek*, the prosecution offered the testimony of a police officer, Bruce Leach, "regarding delayed disclosure" in sexual-assault cases "as simply a police officer giving lay testimony based on his training and experience without . . . being first qualified as an expert, while suggesting to the jury that Leach was an expert on the subject." *Id*. at 76. The trial court ruled that the testimony was admissible as lay testimony and instructed the jury as such. *Id*. at 76-77. On appeal, defendant challenged this ruling, arguing that this testimony required that the police officer be qualified as an expert. *Id*. at 76.

This Court analyzed this issue as follows:

> Because Leach was testifying about delayed disclosure on the basis of knowledge, experience, and training, it would appear that his testimony constituted expert opinion testimony and not lay opinion testimony under MRE 701, which is limited to opinions or inferences that are "rationally based on the perception of the witness" and that are "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." The caselaw on this issue is not entirely clear. For example, in *Chastain v Gen Motors Corp (On Remand)*, 254 Mich App 576; 657 NW2d 804 (2002), the trial court permitted a police officer to give lay opinion testimony under MRE 701 that the plaintiff was not wearing his seatbelt. This Court affirmed, rejecting the plaintiff's claims that the trial court should not have admitted evidence under MRE 701, that expert testimony under MRE 702 was necessary, and that the officer was not qualified to give an expert opinion on the issue. The *Chastain* panel held that the lay opinion was not admitted in error because the testimony was based on the officer's perceptions at the scene of the accident and because the opinion was not based on his past experience in investigating car accidents. *Chastain*, *supra* at 586-590. The Court stated, "A careful examination of [the officer's] testimony establishes that although his opinion in this case was consistent with conclusions he had drawn in other cases he had investigated, his past experience did not form the basis of his opinion." *Id*. at 590. Here, Leach's testimony on delayed disclosure was drawn from his past experiences and training.
>
> In *Co-Jo, Inc v Strand*, 226 Mich App 108; 572 NW2d 251 (1997), the plaintiffs argued that an off-duty fireman's opinion testimony regarding the speed

-4-

at which a building burned was improperly admitted as lay opinion testimony under MRE 701 because expert testimony was required and the fireman was not qualified as an expert. This Court held that the trial court did not abuse its discretion in admitting the opinion evidence regarding the speed and intensity of the fire. *Co-Jo*, *supra* at 117. The *Co-Jo* panel stated:

> [The fireman's] conclusions were based on observation of the fire for over thirty minutes. The opinion testimony was limited to describing the fire in relation to other building fires [the fireman] had witnessed. The reliability of his conclusions was premised on his extensive experience in observing other building fires and investigating their causes. The testimony was of a general nature, without any reference to technical comparison of scientific analysis. [*Id.*]

> Under *Co-Jo*, it could be reasonably argued that Leach's testimony was acceptable lay opinion testimony. *Co-Jo* appears to be at odds with *Chastain*. We, however, do not need to resolve the issue, and the apparent conflict in caselaw gives credence to a conclusion that the prosecutor did not pursue the challenged questioning in bad faith. Assuming that expert testimony was required, Leach was more than qualified to give an expert opinion on delayed disclosure to the extent of the testimony actually presented. He testified at length about his extensive knowledge, experience, training, and education concerning the sexual abuse of children. Leach has personally participated in the investigation of hundreds of criminal sexual conduct cases involving child victims. And he had received training in the investigation of cases involving delayed disclosure. With his background and experience in investigating child sex abuse cases and interviewing victims, Leach became knowledgeable regarding delayed disclosure, and, according to Leach, delayed disclosure is common and happens quite frequently with child victims. On this record, the disputed testimony was admissible, and the prosecutor acted in good faith in eliciting the testimony. Accordingly, reversal is unwarranted. [*Dobek*, 274 Mich App at 77-79 (alterations in original).]

In our view, *Dobek* is dispositive of the arguments made by defendant in this regard. Even if we assume that expert testimony was required as argued by defendant, *Dobek*, 274 Mich App at 79 ("Assuming that expert testimony was required, Leach was more than qualified to give an expert opinion on delayed disclosure to the extent of the testimony actually presented."), Specialist Latham's testimony supports a conclusion that he was sufficiently qualified to give the testimony at issue. At trial, Specialist Latham testified that he was employed as a "crime lab specialist" with the Kalamazoo Department of Public Safety and had been "since 2006," that he had "been a public safety officer since 1998," and that he was a "crime lab technician [from] 2002 [until being] promoted to crime lab specialist in 2006"; that he has "a Bachelor of Science in Criminal Justice with an emphasis in criminalistics" and had "interned with the Kalamazoo Crime Lab while . . . going through [his] college years"; and that he had completed "accident reconstruction training," "over 200 hours in crime scene analysis training, about 360 hours in traffic crash investigation training, over 150 hours in forensic video training, 300 hours training

in controlled substance examination . . . and 150 hours of training in firearms and shooting scene construction." Based on this experience, education, and training, Specialist Latham then provided extensive testimony regarding the differences between various types of firearms.

Applying the rules set forth above to these facts, we conclude that, "[a]ssuming that expert testimony was required, [Specialist Latham] was more than qualified to give an expert opinion . . . to the extent of the testimony actually presented." *Dobek*, 274 Mich App at 79. It is apparent that Specialist Latham had years of experience, years of education, and hours of training with respect to crime-scene investigations. Based on this experience, education, and training, it is equally apparent that he became quite knowledgeable regarding the differences between various types of firearms and bullets. It was this experience, education, training, and knowledge that he used to reach his opinion that the bullet recovered from the victim's body was "more consistent with being fired from a revolver." In short, there is nothing in the record to suggest that the requirements of MRE 702—(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case—would not be satisfied in light of Specialist Latham's experience, education, training, and knowledge. We therefore conclude that the admission of Specialist Latham's testimony does not require reversal.

On appeal, defendant argues that, "[e]ven if Mr. Latham had been qualified as an expert witness, which is doubtful given his lack of specialized training, it is questionable whether his analysis of the bullet and hole in the van fender met the standards under MRE 702." Specifically, he argues that Specialist Latham's opinion in this regard was not based on sufficient facts or data, was not the product of reliable principles and methods, and that Specialist Latham had not applied the principles and methods reliably to the facts of the case. MRE 702. To support this position, defendant points to a variety of authorities reflecting what he implies are weaknesses in ballistics experts' testimony and argues that "toolmark identification is highly subjective, unreliable, completely unscientific, subject to error, and lacking a precisely defined process . . . ." However, this Court has recognized the admissibility of ballistics experts' testimony in the past, and we decline to express any disagreement with that conclusion at this time. See, e.g., *People v Oliver*, 170 Mich App 38, 49-50; 427 NW2d 898 (1988).

Finally, even if we assume error with respect to MRE 701 or MRE 702 as defendant suggests, we nevertheless conclude that reversal is not required because the admission of this testimony was not outcome determinative. On appeal, defendant's position is that this testimony was the only evidence that "directly linked the fatal bullet to Daquan's unrecovered gun." In essence, defendant portrays the issue presented to the jury as a question "about which gun— Daquan's or Tyler's—fired the fatal shot in this chaotic shootout." This position is simply inconsistent with the evidence presented by both parties and defendant's trial theory. Defendant testified that he fired two shots, and he expressly acknowledged that one of his shots "was in the vicinity of [the minivan]." In fact, according to Detective Johnson, defendant "admitted that he actually shot twice at the people as he was running." He explained that he did so because he "was scared" and "fear[ed] for [his] life." Similarly, in his closing argument, trial counsel argued that defendant shot at the victim in self-defense. Conversely, no witnesses testified that it was possible that Tyler, not the defendant, actually shot the victim, as defendant now claims. Therefore, because any error was not outcome determinative, reversal is not required.

## B. PROSECUTORIAL ERROR

On appeal, defendant also takes issue with four instances of alleged prosecutorial error. First, he argues that the prosecutor committed prosecutorial error when "he offered the irrelevant testimony of the decedent's father, Charles Adams, describing his son's personality as a young child and as he grew older." Second, he argues that the prosecutor committed prosecutorial error in presenting Specialist Latham's testimony as discussed above. Third, he argues that the prosecutor committed prosecutorial error by "us[ing] unnecessary, irrelevant, and very graphic language in his closing argument regarding the decedent's blood loss." Finally, he argues that the prosecutor committed prosecutorial error by "repeatedly vouch[ing] for the truthfulness of one of the state's key witnesses, Christian Ruiz, in his closing argument." We disagree in all four respects.

Generally, an assertion of prosecutorial error must be met with a contemporaneous objection. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). If it is not, review is precluded unless "an objection could not have cured the error, or a failure to review the issue would result in a miscarriage of justice." *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* Constitutional errors are generally reviewed de novo. *Rodriguez*, 251 Mich App at 25. Unpreserved errors, however, are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764.

To find that prosecutorial error occurred, this Court must determine that the prosecutor's conduct deprived the defendant of a fair and impartial trial. *Dobek*, 274 Mich App at 63. Assertions of prosecutorial error must be reviewed in context and on a case-by-case basis. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010). A prosecutor's argument may be based on admitted evidence as well as any reasonable inferences that may be drawn therefrom. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). This includes arguing whether a witness is or is not credible. *People v Unger*, 278 Mich App 210, 240; 749 NW2d 272 (2008). Nevertheless, a prosecutor is not permitted to vouch for a witness's credibility, meaning that he or she may not assert that he or she has special knowledge regarding a witness's truthfulness. *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009). "Appeals to the jury to sympathize with the victim constitute improper argument." *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001).

At the outset, we could reject each of defendant's claims of prosecutorial error because each instance could have, but was not, met with a contemporaneous objection that could have cured any error. *Bennett*, 290 Mich App at 475; *Callon*, 256 Mich App at 329. Nevertheless, in applying the rules set forth above to the alleged instances of prosecutorial error as identified by defendant, we conclude that reversal is not required. First, with respect to the victim's father's testimony, defendant takes issue with the father's testimony that his son was "very fearless, loved to be outside playing," "loved to ride his bike, chase around his brother," "loved football," "did very well in middle school, elementary, A, B, C student," "got around some of the wrong crowd" during high school, worked for the family business, and had "talked about some of his future plans and what he wanted to do with his life" on the day of the shooting. Defendant claims that this testimony was irrelevant and improperly injected sympathy for the victim.

However, when reviewed in context, it is apparent that a portion of this brief testimony was responsive to defendant's theory at trial—it rebutted defendant's assertion that the victim, Ruiz, and Bishop had been "following us . . . driving around wherever we were at, they were" on the day of and in the days before the shooting. Further, as indicated below, any testimony that might have exceeded this responsive scope represented error that was presumptively cured in light of the trial court's express and specific instruction that sympathy could not impact the jury's decision. Second, with respect to Specialist Latham's testimony, we disagree with defendant's argument that the prosecutor's efforts to admit the testimony discussed in Section A of this opinion constituted prosecutorial error for the reasons cited above. Third, with respect to the allegedly improper argument used by the prosecutor during closing, we reject defendant's argument that this "irrelevant," "unnecessary," and "very graphic" language improperly injected sympathy into the jury. Rather, the prosecutor simply argued facts in evidence; specifically, the prosecutor's argument was accurately premised on testimony provided by Dr. Joyce DeJong, who testified "as an expert in the area of forensic pathology." *Bahoda*, 448 Mich at 282; *Unger*, 278 Mich App at 240. While the prosecutor may not have used the blandest possible language, we discern no error requiring reversal in that regard. Finally, with respect to defendant's allegations of credibility vouching, the record reflects that the prosecutor argued that Ruiz was a credible witness, not that he had any special knowledge regarding Ruiz's truthfulness. *Unger*, 278 Mich App at 240; *Seals*, 285 Mich App at 22. Therefore, each claim of prosecutorial error raised by defendant is meritless. Furthermore, even if we assume error, the jury instructions provided by the trial court presumptively cured any error, and defendant makes no effort to overcome this presumption. *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003) ("Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors.").

## C. MRE 804(B)(1) & CONFRONTATION RIGHTS

On appeal, defendant claims that the admission of Charles Wright's preliminary examination testimony during trial violated MRE 804(B)(1) and his constitutional right to confront the witnesses against him. We disagree.

> Rule 804(B)(1) of the Michigan Rules of Evidence provides that, where a witness is unavailable, testimony given by the person at an earlier hearing is not excluded by the hearsay rule if the party against whom the testimony is offered had an opportunity and similar motive to develop the testimony through cross-examination. [*People v Meredith*, 459 Mich 62, 66-67; 586 NW2d 538 (1998).]

"Even when evidence of an unavailable witness is admissible under the Michigan Rules of Evidence, it is still necessary to determine whether use of the testimony would violate a defendant's constitutional right to confront prosecution witnesses." *Id*. at 67. Defendant's arguments on appeal focus on whether the witness at issue, Charles Wright, was legally "unavailable" for purposes of MRE 804(B)(1) and the Confrontation Clause.

A witness is "unavailable" pursuant for purposes of MRE 804(B)(1) when he or she "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown." MRE 804(a). Due diligence requires that the prosecution make a good-

faith, reasonable effort to locate the witness for trial. *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). Whether the prosecution made a good-faith, reasonable effort to locate a witness for trial depends on the facts and circumstances of each case. *People v McIntosh*, 389 Mich 82, 87; 204 NW2d 135 (1973).

On appeal, defendant claims that the prosecution's efforts to procure Wright's presence at trial was "too little too late." Had Wright's preliminary examination testimony been excluded and had the jury been instructed consistent with CJI2d 5.12, defendant claims, this "may have tipped the scales in favor of acquittal." However, as the trial court recognized, an arrest warrant remained outstanding for Wright at the time of trial, Wright's mother repeatedly expressed her desire to keep her son from testifying, and the prosecution made a variety of other efforts, including, for example, personally visiting Wright's mother's residence less than one week before trial, to procure Wright's presence. We agree that these efforts were sufficient for purposes of MRE 804(b)(1) and the Confrontation Clause.

Defendant also claims that the Michigan Supreme Court's decision in *People v Dye*, 431 Mich 58, 77-78; 427 NW2d 501 (1988), compels a different conclusion. However, that case is distinguishable because it involves scenarios where law enforcement had, but failed to follow through on, a variety of leads with respect to three witnesses' locations. The Supreme Court explained, "If the prosecution relies on out-of-state police to follow particular leads, and they make a diligent good-faith effort to find and produce the witness, then their efforts may discharge the prosecution's obligation. In the instant case, however, there is no evidence that the out-of-state police made diligent good-faith efforts." *Id*. at 77. In the case at bar, however, the record reflects *no* leads that law enforcement failed to follow up on. Rather, law enforcement repeatedly made contact with Wright's mother and pursued his arrest on an already-issued warrant. In short, it is unclear what further steps the prosecution might have taken, and defendant does not articulate any either. Consequently, *Dye* does not control the outcome of this case.

Defendant also claims that the disparity between the length of questioning other witnesses at preliminary examination and at trial reflects that cross-examination at preliminary examination simply is not sufficient for purposes of the Confrontation Clause. This claim lacks factual and legal support. Factually, defense counsel's cross-examination of Wright at preliminary examination was relatively thorough, and defendant makes no effort to identify areas that should have been further developed. Most notably, defense counsel secured Wright's testimony that he, defendant, and Pulliam had received various threats during the days leading up to the shooting, which supported defendant's self-degree theory. Legally, Michigan courts have long recognized "that the preliminary examination testimony of an unavailable witness may be used at trial upon a showing that the testimony bears satisfactory indicia of reliability," and there is nothing to suggest that Wright's preliminary-examination testimony was anything but reliable. *Meredith*, 459 Mich at 68.

Furthermore, even if assumed that the admission of Wright's testimony violated MRE 804(B)(1) and the Confrontation Clause, any error in this regard was harmless beyond a reasonable doubt. *People v Shepherd*, 472 Mich 343, 348; 697 NW2d 144 (2005) ("Harmless error analysis applies to claims concerning Confrontation Clause errors, see *Delaware v Van Arsdall*, 475 US 673, 684; 106 S Ct 1431; 89 L Ed 2d 674 (1986)."). While defendant claims

that the exclusion of this testimony and an instruction consistent with CJI2d 5.12 "may have tipped the scales in favor of acquittal," Wright's testimony did nothing more than corroborate the testimony of several other witnesses. Like many other witnesses, he testified that Bishop and defendant both had firearms and that he heard two shots: "one shot and it hit the van" "[a]nd then . . . another shot but I don't know who shot it." The fact that Wright denied knowing who shot the second shot or where it went makes it difficult to ascertain how prejudicial Wright's testimony truly was. Therefore, any error, assuming one, was harmless.

## D.  SUFFICIENCY OF THE EVIDENCE

On appeal, defendant also argues that the prosecution failed to prove that he was guilty of second-degree murder beyond a reasonable doubt. Specifically, defendant claims that the prosecution did not specifically disprove his position that he was acting in self-defense. We disagree.

An insufficient-evidence claim is reviewed de novo. *People v Sherman-Huffman*, 241 Mich App 264, 265; 615 NW2d 776 (2000). When determining whether there was sufficient evidence to support a jury's verdict, this Court reviews the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find every element of the crime at issue beyond a reasonable doubt. *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979). In this case, defendant was convicted of second-degree murder, which required that the prosecution prove "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). Thus, with respect to malice, the prosecution was required to prove "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id*. at 464. However, because defendant introduced the theory of self-defense, the prosecution was additionally tasked with the burden of disproving that defense beyond a reasonable doubt. *People v Fortson*, 202 Mich App 13, 20; 507 NW2d 763 (1993).

Here, defendant introduced the concept of self-defense. Specifically, he claimed that, based on the threats and presence of a firearm, defendant fired a warning shot and a shot at the minivan out of fear for his life. The prosecution presented a variety of evidence rebutting this claim, and it is apparent that the jury rejected, at least to an extent considering the second-degree conviction, defendant's self-defense claim. Viewing the evidence in a light most favorable to the prosecution, even considering the beyond-a-reasonable-doubt standard of proof, it is apparent that the determination of whether defendant truly acted in self-defense was a credibility determination for the jury. *Hampton*, 407 Mich at 368 ("The resolution of credibility disputes is within the exclusive province of the trier of fact."). Indeed, it is conceivable that defendant's own testimony and statements, which included his acknowledgment that he fired a warning shot, undermined a claim that he feared for his life, and the jury was free to accept or reject this testimony. In essence, defendant's appellate claim asks this Court to accept defendant's theory of this case as fact, and this Court is not permitted to resolve such a credibility dispute anew on appeal.

## E.  JAIL RECORDINGS

Lastly, defendant argues that the trial court's decision to admit shortened recordings of jail calls violated MRE 106 and MRE 403. We disagree.

Preserved evidentiary issues are reviewed for an abuse of discretion. *Orr*, 275 Mich App at 588. Constitutional errors are generally reviewed de novo. *Rodriguez*, 251 Mich App at 25. Unpreserved assertions of error like this one, however, are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764.

MRE 106 provides as follows: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other party or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." "The premise of the rule is that a thought or act cannot be accurately understood without considering the entire context and content in which the thought was expressed." *People v McReavy*, 436 Mich 197, 214-215; 462 NW2d 1 (1990). This Court has previously recognized that a defendant's opportunity to defend allegations during direct-examination in lieu of playing certain recorded statements "had the potential to be more compelling evidence in favor of the defense than the tape itself . . . ." *People v Herndon*, 246 Mich App 371, 409; 633 NW2d 376 (2001).

Applying those rules to the facts of this case, we conclude that that trial court's decision did not constitute an abuse of discretion. First, MRE 106 does not require completeness in every circumstance, much less completeness as defendant describes it, i.e., every jail call because part of one or more jail calls were admitted; rather it provides that "an adverse party *may* require the introduction" of such evidence. Admitting such evidence is discretionary, and defendant does not identify why the trial court's failure to do so sua sponte was a decision that fell beyond the range of reasonable outcomes. Rather, defendant vaguely claims that context might have helped and offers to provide "the full recordings . . . upon request" if this Court wishes to attempt to support his claim for him. Furthermore, defendant's testimony about the nature of his jail calls, rather than the language of the calls themselves, may well have been more compelling in his favor. *Herndon*, 246 Mich App at 409.

Alternatively, defendant contends that the admission of this evidence was unfairly prejudicial pursuant to MRE 403. MRE 403 provides as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Rule 403 determinations are best left to a contemporaneous assessment of the presentation, credibility, and effect of testimony by the trial judge." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008) (citation and internal quotation marks omitted). All admissible evidence is, to some extent, prejudicial; MRE 403 prohibits only the admission of evidence that is *unfairly* prejudicial. *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998). Evidence may be unfairly prejudicial if it injects extraneous considerations into trial, such as bias, sympathy, anger, or shock. *People v Pickens*, 446 Mich 298, 336-337; 521 NW2d 797 (1994).

Applying those rules to the facts of this case, we conclude that the admission of the partial recordings was permissible under MRE 403. As defendant recognizes in his brief on appeal, these recordings were "[t]he only evidence introduced to substantiate the witness

intimidation charge . . . ." Thus, they were obviously probative. Nevertheless, defendant claims that their admission was unfairly prejudicial because context would have demonstrated that defendant's comments were an "express[ion of] frustration." Defendant does not elaborate further or make any mention of where in the jail calls support for this claim might be found, but it seems that defendant's own testimony, in lieu of these recordings, would have proved equally favorable to defendant. Furthermore, MRE 403 bars the admission of unfairly prejudicial evidence; it does not require the admission of additional evidence to make prejudicial evidence less prejudicial.

## F. INEFFECTIVE ASSISTANCE OF COUNSEL

On appeal, defendant also argues that trial counsel's performance constituted ineffective assistance based on the issues raised in subsections A, B, C, and E of this opinion. However, in light of our conclusions above, we need not specifically address this argument. *People v Riley (After Remand)*, 468 Mich 135, 142; 659 NW2d 611 (2003) ("Ineffective assistance of counsel cannot be predicated on the failure to make a frivolous or meritless motion.").

## III. CONCLUSION

Accordingly, for the reasons set forth above, we affirm defendant's convictions and sentences.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Deborah A. Servitto
/s/ Cynthia Diane Stephens