*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JARVIS LEE GLENN,

        Defendant-Appellant.

UNPUBLISHED
September 19, 2019

No. 343994
Wayne Circuit Court
LC No. 14-004400-02-FC

Before: O'BRIEN, P.J., and BECKERING and LETICA, JJ.

PER CURIAM.

Defendant, Jarvis Lee Glenn, appeals as of right his jury trial conviction of armed robbery, MCL 750.529.[1] We affirm.

## I. FACTUAL BACKGROUND

This case arises from the robbery and murder of Curtis Robinson. Robinson died by gunshot wounds. Glenn and his codefendant, Jessie Lewis, were tried jointly on charges related to Robinson's robbery and shooting. The shooting took place around 5:46 p.m. on April 7, 2014, in the general vicinity of 13515 Maine Street in Detroit, Michigan. Norma Lyte, Lewis's aunt, lived at that address, and Lewis's sisters—Tawana Lyte and Star Lyte—lived across the street.

Around 3:00 p.m. on April 7, 2014, Shavonte Jackson, Robinson's niece, saw Robinson at her house with a man she later identified as Glenn. At 4:30 p.m., Kathleen Urbaniak, the mother of Robinson's son, saw Robinson at a nearby McDonald's with a man she later identified as Glenn. Shortly before 5:46 p.m., Norma saw codefendant Lewis walking up the sidewalk toward her house talking to someone on his cell phone. A few minutes later, Norma heard a loud

---

[1] The jury was unable to reach a verdict on Glenn's charges for felony murder, MCL 750.316(1)(b), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.

-1-

crash and gunshots outside her house. After the gunshots, Norma saw Lewis running down the street. In an April 23, 2014 sworn police statement, Star told the police that she saw Glenn standing in the street on the passenger side of Robinson's car moments after hearing the gunshots, and that Glenn quickly took off running.

At trial, Star claimed that she never saw, nor did she tell police that she saw, Glenn on April 7, 2014. Star claimed that she lied in her April 23 statement because a detective threatened to arrest her and take her children away unless she gave the police information about the shooting.

When the police arrived at the scene of the shooting, they found Robinson's body partially inside his car. Robinson had sustained two fatal gunshot wounds. Multiple witnesses told police officers that they heard a car crash and multiple gunshots. Two cell phones—a black Huawei cell phone and a silver LG cell phone—were discovered lying on the ground near Robinson's car. The police recovered a third cell phone—a black LG cell phone—inside Robinson's car. Detroit Police Officer Jeb Rutledge quickly determined that the black LG cell phone belonged to Robinson. After speaking with Star, Norma, and Glenn's mother, Penny Glenn, the police determined that the black Huawei cell phone belonged to Lewis, and the silver LG cell phone belonged to Glenn.

Following Glenn's April 23, 2014 arrest, he was interviewed by Officer Rutledge. Glenn admitted that he knew Robinson and Lewis, and was with Robinson on April 7, 2014. Glenn also told Officer Rutledge he last spoke with Lewis on April 7, 2014. Glenn could not explain why Star would say that she saw him standing near Robinson's car moments after the shooting.

Cellular telephone records from Glenn's cell phone showed 24 references to "Jarvo," which was Glenn's nickname. Cellular telephone records from Lewis's cell phone showed seven references to Lewis's nicknames, "Mook" and "Dymook." The records showed references to Glenn's and Lewis's nicknames on the day of the shooting, suggesting that Glenn and Lewis carried their cell phones with them on April 7, 2014. The records also revealed that between 5:40 p.m. and 5:46 p.m.—the time when the first 911 call was made—the cell phones belonging to Glenn, Lewis, and Robinson were interacting with the same cellular site, showing that the three men were in the same general location at the same time. At 5:40 p.m., Glenn sent a text message to Lewis, telling Lewis to "take both of his phone[s]. I want onr [sic]." At 5:43 p.m., Glenn sent another text message to Lewis stating that, "it's on, go." After the 911 call at 5:46 p.m., Lewis's phone received several calls that went to voicemail, suggesting that Lewis had his phone on him at the time of the shooting and dropped it near Robinson's car after the shooting.

Glenn did not testify at trial, but Lewis did. Lewis admitted that he owned the black Huawei cell phone and that he knew Glenn, but denied knowing Robinson. According to Lewis, his text message conversation was not about a plan to rob Robinson, but to rob another individual—Lewis planned to steal two cell phones and a computer from a nearby prostitution house. Lewis also claimed that he was texting Glenn's brother, not Glenn, and that Glenn's brother was using Glenn's cell phone to talk to Lewis. Lewis also claimed that his cellular telephone records were incorrect with respect to the timing because he was texting Glenn's brother an hour before the shooting occurred. Lewis claimed that he was walking back to his aunt's house and arguing on the phone with his girlfriend when he heard gunshots and then a car

crash. Lewis dropped to the ground quickly before running away from the area. Lewis claimed that when he fell to the ground, he dropped his cell phone.

## II. PROSECUTORIAL MISCONDUCT

Glenn first argues that he is entitled to a new trial because he was denied a fair trial when the prosecutor repeatedly engaged in prosecutorial misconduct.[2] We disagree.

Because Glenn failed to preserve this issue by objecting to the contested conduct, our review is for plain error affecting substantial rights. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Under the plain-error standard, the defendant must satisfy three requirements: "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, and 3) the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 765; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceeding." *Id*.

Because a prosecutor's role is to "seek justice" rather than to merely convict, "the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 64; 732 NW2d 546 (2007). Claims of prosecutorial misconduct are evaluated on a case-by-case basis, and this Court must consider the prosecution's comments in context. *Bennett*, 290 Mich App at 475. "The propriety of a prosecutor's remarks depends on all the facts of the case." *Dobek*, 274 Mich App at 64 (quotation marks and citation omitted). A prosecutor's remarks are evaluated in light of the defendant's arguments and their relationship to the evidence admitted at trial. *People v Brown*, 279 Mich App 116, 135; 755 NW2d 664 (2008).

Glenn first contends that the prosecutor made two remarks during her opening statement that constitute prosecutorial misconduct. According to Glenn, the first instance occurred when the prosecutor stated as follows:

> You see this crime happened in a location where the defendants are well known. Family lives there. And this by itself isn't necessarily unusual because defendants tend to go to places where they think they can get away with the crime. Or they think they can control the environment or intimidate the witnesses. Or at the very least where people aren't going to tell on them.

Glenn contends that this amounted to "unsworn testimony, and [was] not something the prosecutor reasonably anticipated showing at trial."

Stating facts that the prosecutor intends to prove at trial is permissible during opening statements. *People v Meissner*, 294 Mich App 438, 456; 812 NW2d 37 (2011). The prosecutor

---

[2] This Court recently explained in *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015), that a fairer label for most claims of prosecutorial misconduct would be " 'prosecutorial error,' " while only the most extreme cases rise to the level of " 'prosecutorial misconduct.' " However, we will use the phrase "prosecutorial misconduct" because it has become a term of art.

intended to prove that Glenn and Lewis planned to rob and murder Robinson on Maine Street because they could limit their exposure to individuals less likely to cooperate with the police. The prosecutor called several of Lewis's family members as witnesses in an attempt to prove that Glenn and Lewis chose to commit their crimes on Maine Street for that reason. And while the prosecutor could not introduce evidence proving that *all* criminal defendants choose certain locations to commit their crimes because they believe they can intimidate the witnesses and control the environment, prosecutors are not barred from encouraging jurors to draw common-sense inferences from the facts. *People v Ringsted*, 90 Mich 371, 374; 51 NW 519 (1892) (explaining that it was permissible for a prosecutor to encourage jurors to use "common sense" because "[j]urors are not to be debarred from using common sense in drawing inferences from testimony, and, if common sense is used, the inferences will generally be legitimate and legal ones"). Indeed, prosecutors are afforded wide latitude in doing so. See *Dobek*, 274 Mich App at 66. The prosecutor's statement that perpetrators of a crime want to "get away with the crime" is common sense. The notion that Glenn attempted to conceal his involvement in the crime by choosing to commit the crime at a location where the witnesses would be familiar and therefore less likely to cooperate with police was a reasonable inference, given the facts. Accordingly, the prosecutor's remarks during her opening statement about a defendant's tendency to commit crimes in certain locations were not improper and did not constitute prosecutorial misconduct.

Glenn next challenges the prosecutor's following remark made during her opening:

In addition to that, [Officer Rutledge] did talk to Mr. Jarvis Glenn. Mr. Jarvis Glenn confirmed, yeah, I know [Robinson]. Yeah, I saw him that day. Yeah, I was even with him at a time. But when it gets time to answer the hard questions, he doesn't want to do that. You're going to hear about that.

Glenn argues that it was improper for the prosecutor to comment on his refusal to answer some of Officer Rutledge's questions.

Generally, prosecutors cannot comment on a defendant's constitutional right to remain silent in the face of questioning by a police officer after the defendant has been advised of his *Miranda*[3] rights and exercises his right to remain silent. *People v McGhee*, 268 Mich App 600, 634; 709 NW2d 595 (2005). Yet if a defendant waives his right to remain silent and there is no basis to conclude that the defendant's unresponsiveness to questions is attributable to the invocation of that right or reliance on the *Miranda* warnings, then such evidence of the defendant's silence is not improper and the prosecutor may bring it to the jury's attention. See *People v McReavy*, 436 Mich 197, 203; 462 NW2d 1 (1990).

During her opening, the prosecutor commented that when Officer Rutledge questioned Glenn for this case, Glenn remained silent in response to some questions, but not others. Officer Rutledge testified that this occurred after he advised Glenn of his *Miranda* rights and Glenn waived those rights.

---

[3] *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

As our Supreme Court explained in *McReavy*, 436 Mich at 218-219:

> In situations where a defendant voluntarily waives his Fifth Amendment right to be silent, makes some statements, and then fails to respond to other questions, the focus of the inquiry is whether the defendant is now manifesting either a total or selective revocation of his earlier waiver of Fifth Amendment rights and whether that revocation is induced by the implicit assurances contained in the *Miranda* warnings. If it is concluded that a defendant's lack of response constituted invocation of the right to remain silent which was induced by the government, the failure to respond would again present the "insoluble" ambiguity that *Doyle*[v Ohio, 426 US 610; 96 S Ct 2240; 49 L Ed 2d 91 (1976)] forbids.[23]
>
> ---
>
> [23] If a defendant answered several questions and then invoked his right to remain silent, *Doyle*, 426 US at 618-619, would prevent the prosecutor from commenting on this silence. However, in the present case the defendant did not invoke the right to remain silent until the morning following the interview.
>
> ---
>
> [Footnote omitted.]

A "[d]efendant cannot have it both ways—he cannot choose to speak and at the same time retain his right to remain silent." *People v Davis*, 191 Mich App 29, 36; 477 NW2d 438 (1991).

Glenn does not contend that he ever asserted his right to remain silent after Officer Rutledge advised him of his *Miranda* rights, and there is nothing in the record to suggest otherwise. That is, nothing in the record suggests (and Glenn does not contend) that his unresponsiveness to some of Officer Rutledge's questions was attributable to the invocation of his right to remain silent or reliance on the *Miranda* warnings. "When a defendant speaks after receiving *Miranda* warnings, a momentary pause or even a failure to answer a question will not be construed as an affirmative invocation by the defendant of the right to remain silent." *McReavy*, 436 Mich at 222. Thus, the prosecutor did not commit misconduct when she commented on Glenn's refusal to answer some of Officer Rutledge's questions, but not others.

Glenn next argues that the prosecutor's following exchange with Detroit Police Officer Gentry Shelby constituted prosecutorial misconduct:

> *Q.* And when you said you had a photograph of Jarvis Glenn that you were looking at, do you know, was it a Secretary of State photo or what type of photo it was?
>
> *A.* Wayne County mug shot photo.

Glenn's argument on this issue is a single sentence. Glenn does not explain how or why it was improper for the prosecutor to elicit from Officer Shelby that Glenn's booking photograph was used to identify him. "Such cursory treatment constitutes abandonment of the issue." *People v*

*Matuszak*, 263 Mich App 42, 59; 687 NW2d 342 (2004). Even addressing the argument, Glenn's issue with the booking photograph is presumably that it suggested to the jury that he had a criminal history. Officer Gentry said only that he used Glenn's booking photograph to identify him, without further elaboration. Officer Gentry's comment was brief and isolated. It occurred in the context of Office Gentry's explanation as to how he was able to identify Glenn and arrest him. Neither the prosecutor nor Officer Gentry focused any further on the fact that Glenn's booking photograph was used to identify Glenn. Accordingly, the prosecutor's question did not amount to prosecutorial misconduct.[4]

Glenn's final allegation of prosecutorial misconduct concerns the following statement from the prosecutor's closing argument:

> Ladies and gentlemen, the city of Detroit is a very busy place. The homicide department is a very busy place. They don't have time to say hmmm, Jessie Lewis doesn't seem like a nice guy, let's pin a case on him. They don't have time to say hmmm, Jarvis Lewis-or Jarvis Glenn, not maybe a good guy either, let's pin a case on him. That's not what they do. They go to a scene, they evaluate what they have and then they start to investigate.[5]

As with his last argument, Glenn's argument on this issue is a single sentence and is arguably abandoned. See *id*. Even addressing the argument, it appears that Glenn contends that the prosecutor's statement was an improper bolstering of the police officers' credibility. We disagree.

During Lewis's testimony, he alleged that the police were attempting to "wrongfully convict" him. During closing arguments, Lewis's trial counsel alleged that the police fabricated a connection between Lewis's cell phone and Robinson's death because they wanted to quickly solve the case and move on. In response, the prosecution made the above statement disclaiming any theory that the police manufactured evidence or a connection between Lewis and Robinson's death. Clearly, the prosecutor's comments were made in response to a defendant's argument, and it is well-established that a prosecutor may fairly respond to issues raised by a defendant. *People v Hicks*, 259 Mich App 518, 534; 675 NW2d 599 (2003). The prosecutor's proportionate and direct response to an issue raised by Lewis did not amount to prosecutorial misconduct.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

---

[4] We note also that even if this exchange amounted to prosecutorial misconduct, the single, isolated comment was not so inflammatory that Glenn was prejudiced. See *People v Ericksen*, 288 Mich App 192, 199; 793 NW2d 120 (2010) (concluding that, although the prosecutor's statement during closing argument amounted to misconduct, the defendant was not prejudiced because the statement was not "so inflammatory as to have prejudiced [the] defendant.").

[5] Glenn incorrectly states that the prosecutor said that "cops don't manufacture this."

Glenn argues that he was denied the effective assistance of counsel because trial counsel failed to object to several instances of prosecutorial misconduct as well as improper remarks by the trial court. We disagree.

Because Glenn failed to file a motion in the trial court for a new trial or an evidentiary hearing, his ineffective assistance claim is unpreserved. See *People v Sabin*, 242 Mich App 656, 658; 620 NW2d 19 (2000). This Court reviews unpreserved claims of ineffective assistance based on the facts contained in the existing record. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

Whether effective assistance of counsel has been denied is a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews questions of constitutional law de novo, and factual findings, if any, are reviewed for clear error. *Jordan*, 275 Mich App at 667.

To demonstrate ineffective assistance of counsel, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Effective assistance is "strongly presumed," *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012), and the defendant bears the heavy burden of proving otherwise, *People v Dixon*, 263 Mich App 393, 396; 688 NW2d 308 (2004)

Glenn argues that trial counsel was ineffective for not objecting to the four alleged instances of prosecutorial misconduct discussed above. Because we concluded that none of the alleged instances amounted to prosecutorial misconduct, trial counsel was not ineffective for failing to object. See *People v Knapp*, 244 Mich App 361, 386; 624 NW2d 227 (2001) (explaining that trial counsel is not required to make frivolous or meritless objections).

Moreover, defendant has not explained how trial counsel's failure to raise an objection to any of the alleged instances of prosecutorial misconduct, even if objectively unreasonable, could have resulted in a different outcome. The prosecution presented substantial evidence connecting Glenn to the armed robbery of Robinson. Urbaniak and Jackson both saw Glenn with Robinson a few hours before the robbery and shooting took place. Star told the police that she saw Glenn standing outside of Robinson's car moments after the shooting. The police discovered Glenn's cell phone next to Robinson's body. Text messages between Glenn and Lewis showed that the two men were communicating with each other about a robbery moments before Robinson was robbed and murdered. Even if trial counsel had objected to the instances of alleged misconduct pointed to by Glenn on appeal, the untainted evidence connecting Glenn to the robbery of Robinson would still have been before the jury. Thus, there is not a reasonable probability that, but for trial counsel not objecting to the instances of alleged prosecutorial misconduct, the result of Glenn's trial would have been different. *Trakhtenberg*, 493 Mich at 51.

Next, Glenn challenges trial counsel's failure to object to certain remarks made by the trial court. Glenn takes issues with the following exchange during Officer Rutledge's testimony:

> *The Court*: I have one question.

Officer Rutledge, did you ever tell Star Lyte that she had to say that Jarvis Glenn was there or you were going to put Child Protective Services on her to have her children taken away?

*Witness Officer Rutledge.* I would have had no way of knowing who Jarvo was if it wasn't for her.

The interviews that I took with Star -- all of the interviews that I ever had with her were all recorded on video.

*The Court*: Is the answer then, no?

*Witness Officer Rutledge*: The answer is, no.

*The Court*: Okay, that's what I thought

Glenn contends that based on this exchange, the trial court "inject[ed]" an "opinion relating to Officer Rutledge's credibility, and, by inference, the lack of credibility of [Star's] testimony . . . ." In context, however, we cannot agree with Glenn's characterization of the trial court's statement. The trial court asked Officer Rutledge a question, and when the officer's answer was somewhat nonresponsive, the trial court sought clarification. When Officer Rutledge told the trial court that it had properly understood his answer, the trial court said, "Okay, that's what I thought." Defendant appears to contend that the trial court was saying that it thought Officer Rutledge's answer to its original question would be "no," but in context, the trial court was clearly saying that it thought that Officer Rutledge answered "no" to the question once it was asked. Trial counsel was not ineffective for not objecting to the trial court's remark because there was nothing improper about it. See *Knapp*, 244 Mich App at 386.

Even so, to the extent that the trial court's remark could have been construed by jurors in the way that Glenn argues and that trial counsel should have objected, Glenn cannot establish that he suffered prejudice. The trial court's remark was one line in a five-day trial. During those five days, the prosecution presented substantial evidence connecting Glenn to the robbery and murder of Robinson. Moreover, during final jury instructions, the trial court instructed the jurors that none of its comments were intended to express a personal opinion about the case, and that if the jurors believed that the trial court had a personal opinion on something, they should disregard it. Jurors are presumed to follow the trial court's instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Thus, there is not a reasonable probability that, but for trial counsel not objecting to the trial court's statement, the result of Glenn's trial would have been different. *Trakhtenberg*, 493 Mich at 51.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Jane M. Beckering
/s/ Anica Letica

-8-